# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY                           SUPERIOR COURT NO.

|  |  |
|---|---|
| ELAINE RABINOW, (a/k/a Lainey Rabinow) | ) ) ) ) |
| Plaintiff | ) ) ) |
| v. | ) ) ) ) ) |
| RSM US, LLP, ELENA VER PLANCK, DILIA TEIXEIRA, KALEIGH CONLEY, MICHELLE BURKE, AND THOMAS DIMINO | ) ) ) ) |
| Defendants | ) ) |

## COMPLAINT

The Plaintiff, ELAINE RABINOW (a/k/a Lainey Rabinow) ("Plaintiff"), sets forth below her complaint based on the discriminatory and retaliatory conduct of the Defendants, RSM US, LLP ("Defendant" or "RSM"), Defendant Elena Ver Planck ("Elena"), Defendant Dilia Teixeira ("Dilia"), Defendant Michelle Burke ("Michelle"), and Defendant Kaleigh Conley ("Kaleigh Conley"). The Plaintiff alleges that she was unlawfully discriminated and retaliated against on the basis of her age and wrongfully terminated from her employment with RSM. She also asserts claims of intentional interference with advantageous relations and intentional infliction of emotional distress against the individual defendants.

## THE PARTIES

1. The Plaintiff, ELAINE RABINOW ("Ms. Rabinow"), is an individual residing in Natick, Massachusetts.

2. The Defendant, RSM US, LLP ("Defendant" or "RSM"), is a Massachusetts corporation doing business in the Commonwealth of Massachusetts at 80 City Square, Boston, MA 02129.

3. The Defendant, ELENA VER PLANCK ("Elena"), is an individual residing at 6 Woods Hill Circle, Woburn, MA 01801.

4. The Defendant, DILIA TEIXEIRA ("Dilia"), is an individual residing at 21 Captain Circle, Tewksbury, MA 01876 and at all relevant times was employed by the Defendant RSM.

5. The Defendant, KALEIGH CONLEY ("Kaleigh"), is an individual residing at 130 Edwin St, Quincy, MA 02171-2033 and at all relevant times was employed by the Defendant RSM.

6. The Defendant, MICHELLE BURKE ("Michelle"), is an individual residing at 41 Emerson St, Reading, MA 01867-1023 and at all relevant times was employed by the Defendant RSM.

7. The Defendant, THOMAS DIMINO ("Mr. Dimino"), is an individual residing at 80 City Square, Boston, MA 02129 and at all relevant times was employed by Defendant RSM as Managing Partner and in a supervisory role over Ms. Rabinow during her employment.

## FACTS AND CIRCUMSTANCES

8. The Plaintiff refers to the allegations of Paragraphs 1 through 7 and by such reference repleads and incorporates them as though fully set forth here.

9. On September 17, 2018, Ms. Rabinow, at 64 years old, was a seasoned professional with a stellar performance record and a wealth of experience, who was enthusiastic about starting her new job as an Executive Assistant job for RSM in Charlestown, MA.

10. Her hopes for finding a productive and welcoming workplace, however, were quickly extinguished after her arrival at RSM.

11. Ms. Rabinow endured humiliating, unprofessional, discriminatory and retaliatory behavior during the time she worked at RSM. Not only did her immediate supervisor, Elena Ver Planck, Operations Manager ("Elena"), ridicule Ms. Rabinow because of her age in their conversations, but Ms. Rabinow also experienced an unusual amount of hostility and inappropriate behavior from her significantly younger and less experienced co-workers, Kaleigh Conley ("Kaleigh") and Michelle Burke ("Michelle"), who were also supervised by Elena. This hostile work environment endured for the duration of Ms. Rabinow's employment.

12. When Ms. Rabinow now looks back and reflects upon her interviews prior to being hired, there was a foreshadowing of the age bias and the pattern of discriminatory treatment she was to confront in the RSM workplace. During these interviews, Elena, for example, said to her, "this is a very young company - I want to know how you will handle that?" It is also worth noting that for the first three weeks of Ms. Rabinow's employment at RSM, Elena invited her out to lunch every day and during the lunches Elena would often talk about how young and immature Kaleigh and Michelle were but that their inexperience was not an issue since "Stacy and Tom loved them".

13. Ms. Rabinow answered her by saying, "I feel that being an older employee provides me the opportunity to model mature and wise behavior." Ms. Rabinow strived to

dispel Elena's concern about Ms. Rabinow's age, but in the end, this proved futile in preventing Elena's and RSM's discriminatory treatment of her.

14. Against all odds, Ms. Rabinow performed her work in excellent fashion and received positive feedback from the field and the people she supported at RSM.

15. During her employment at RSM, Ms. Rabinow received close to 650 Accolades, in increments of 25 points. This was on top of the many phone calls and emails she received from others on the RSM team, who were grateful and appreciative for her knowledge and expertise in helping them navigate Technical Accounting Consulting ("TAC") and RSM. As new accountants joined the TAC group, they were, for the most part, immediately given client projects. However, they were rarely given sufficient training and on-boarding. For example, during the process of preparing a SOW (Statement of Work), it became clear that many processes and procedures were not clear to new employees: how does a SOW get drafted, who approves the pricing model, how does client information and project description get entered into Customer Relationship Management ("CRM"), etc. Therefore, Ms. Rabinow experienced almost weekly calls from these new employees seeking guidance and help regarding the CRM tool. Furthermore, adding complexity to the situation, there were people from other departments at RSM (i.e. Audit  Tax) who might be entering information into CRM for a particular client without Ms. Rabinow's knowledge. In other words, Ms. Rabinow's CRM maintenance was only as effective as the communication she received from other departments as well as from her own team members, the TAC group.

16. While Ms. Rabinow worked in dedicated fashion to achieve this success, Kaleigh and Michelle engaged in efforts to sabotage such success and would communicate micro-aggressions to Ms. Rabinow. Often, for example, they would reference Ms. Rabinow's age and opine that she was "not current" with certain software. For example, if Ms. Rabinow did not know a specific Excel formula, they would immediately seek her supervisor out, Elena, and tell her that Ms. Rabinow is "out of date with Excel experience." Ms. Rabinow, however, had taken Excel proficiency tests before being hired and did well enough that she was hired. Beyond that, Ms. Rabinow felt uncomfortable even asking a question for fear of being ridiculed and being "out-of-touch" or "behind the times."

17. In addition, Michelle and Kaleigh were assigned to train and onboard Ms. Rabinow, but they failed to complete this task earnestly and fairly. They were directed to meet with Ms. Rabinow for approximately eight different sessions for her onboarding and training, but for nearly half of these scheduled meetings, when Ms. Rabinow went to the designated room for training, they never showed up and no explanation, no apology or make-up training was provided to Ms. Rabinow. On the days that they did show up, their training was haphazard, disorganized and basically worthless.

18. Such training was critical for Ms. Rabinow because RSM is heavily branded from a marketing perspective and all proposals and statements of work that she would be preparing required her to follow extensive and detailed guidelines.

3

19. Even Thomas Dimino, RSM Partner, acknowledged to Ms. Rabinow that her training had been deficient, telling her one day: "I know the training has not been what we had hoped for."

20. Despite this lack of training, Ms. Rabinow, a self-starter, took the initiative to find resources within the company to get information and get questions answered. Over time, through her own initiative, she was able to gain an understanding and expertise relative to her role. For example, Ms. Rabinow sought out informal training from Erica Gonzalez who had substantial expertise with CRM.

21. Meanwhile, younger co-workers were treated differently than Ms. Rabinow during their training.

22. Elena also failed to provide the training herself, despite knowing of its deficiencies. Instead, she continued with her abusive and inappropriate communication with Ms. Rabinow, offering only a constant pattern of criticism. Such mistreatment resulted in Ms. Rabinow's emotional and physical distress, requiring her to seek medical care as she began to experience greater and more prolonged bouts of anxiety and depression.

23. While Ms. Rabinow had always been a smart and quick learner, and had been successful in her distinguished career, she suddenly found herself in an environment in which she was constantly being diminished, harassed and demeaned. She could not understand why this was happening to her and observed that her younger colleagues were not being treated so disparately or unfairly.

24. This distress was only exacerbated by Elena's public criticism of her in front of Kaleigh and Michelle.

25. In addition, Elena often would publicly and maliciously humiliate Ms. Rabinow by comparing her to Kaleigh and Michelle, and exalt their work performance above Ms. Rabinow's and announce that they did not make the mistakes Ms. Rabinow was making.

26. However, when Ms. Rabinow investigated this further, she discovered that this was not true. In fact, Michelle and Kaleigh were making similar and innumerable mistakes and errors on their work. They, however, did not receive the criticism or mistreatment that Ms. Rabinow endured.

27. Ms. Rabinow's former colleague, Joanna Mannion ("Ms. Mannion"), who was approximately 42 years old at the time, observed this age-related animus and hostile treatment and watched the way Ms. Rabinow was treated differently than the RSM younger employees. Ms. Mannion was employed as a TAC Resource Manager for RSM and sat next to Elena.

28. In fact, when Ms. Mannion spoke positively about Ms. Rabinow to Elena, Elena told her on or around December of 2018, "don't get too attached".

4

29. Ms. Mannion observed Elena's personal and degrading attacks and hostility towards Ms. Rabinow.

30. During December 2018 through January 2019, Ms. Mannion heard the commentary about Ms. Rabinow from Elena degenerate to personal attacks and underlying, unfounded hostility towards Ms. Rabinow specifically.

31. Every time Ms. Rabinow would walk by, Elena, for example, would roll her eyes and make unkind comments about her physical appearance.

32. Ms. Mannion heard these attacks against Ms. Rabinow daily and the negative commentary about Ms. Rabinow's work product, although Ms. Mannion personally worked with Ms. Rabinow daily and found her to be knowledgeable and helpful.

33. On several occasions, Ms. Mannion witnessed Ms. Rabinow at Elena's desk to ask a question and in response, Elena was hostile, rude and unhelpful. Elena was combative as Ms. Rabinow would calmly explain herself. When Ms. Rabinow would leave the desk, Elena would go on a diatribe about Ms. Rabinow and her alleged "ineptitude", and again, the rants would often turn personal.

34. Elena was persistent in mentioning that Ms. Rabinow made so much more money than others in "the admin group." Ms. Mannion informed Defendant RSM's Human Resources("HR") about the hostile and discriminatory work environment, but HR took no remedial action nor did they offer Ms. Mannion any recommended course of action.

35. After the holidays, the hostility continued unabated and was directly primarily towards Ms. Rabinow. After a practice meeting, Ms. Rabinow shared with Ms. Mannion her distress about the hostile manner in which she was being treated in the workplace. Ms. Mannion was concerned for Ms. Rabinow's job security and was concerned her mistreatment was age-based bias.

36. Elena continued to harass Ms. Rabinow nonetheless and even one day, after Ms. Rabinow had walked to work in the rain from the commuter train, she told her that her appearance was terrible and that "[RSM Partner] Stacy [Dow] would be horrified if she was in the office today." During a meeting in January 2019, Ms. Rabinow had endured enough abuse and told Elena: "I cannot have this conversation with you anymore unless we are in an office with HR."

37. Elena was shocked and, of course, wanted to avoid this but she also knew that she could not. The two then met with Shauna Weber, HR Director, in January 2019.

38. During that meeting with Elena and Shauna, Ms. Rabinow described the discriminatory, inappropriate and abusive behavior that Elena had exhibited toward her. Shauna acknowledged the seriousness of what had transpired and saw

5

Ms. Rabinow cry in her presence.

39. Unbeknownst to Ms. Rabinow, her experience with Elena and communication to HR was simultaneously being also reported to Defendant RSM's HR by Ms. Mannion. Meanwhile, Shauna had instructed Elena that it was "imperative" that she articulate any concern that she had about Ms. Rabinow because Ms. Rabinow was "older."

40. In a meeting with Ms. Mannion late in January, Ms. Mannion confided to Ms. Rabinow that she too had gone to Defendant RSM's HR and was suffering with tremendous anxiety while working with Elena.

41. Ms. Mannion also mentioned to Elena that she had met with Ms. Rabinow, and in response, Elena told her "Don't get involved". The next week, Elena told Ms. Mannion that "Lainey is going to get fired tomorrow".

42. Indeed, Elena had been told by Shauna that Defendant RSM was going to terminate Ms. Rabinow and that Elena should open up a "confidential job requisition" for Ms. Rabinow's position. Shauna told Elena that the plan was to interview for Ms. Rabinow's replacement during the spring/Easter time period. When Elena shared this information with Mr. Thomas Dimino, a managing partner for Defendant RSM, Mr. Dimino told Elena that Ms. Rabinow was likely going to sue the company for age discrimination. Mr. Dimino, who also had a supervisory role over Elena, had expressed a dislike of Ms. Rabinow and had previously told Elena to "get rid" of her.

43. During the meeting with Defendant RSM's HR, Elena explained to Shauna (and Ms. Rabinow) that part of the reason the other Executive Assistants (Michelle Burke and Kaleigh Conley) were resentful toward Ms. Rabinow is that she made "more money" than they did. When Ms. Rabinow questioned how they even knew this, she was given a non-explanatory response. Elena did come back from that meeting and told Ms. Mannion that she was upset she could not fire Ms. Rabinow.

44. Ms. Mannion then reported these developments she learned of from Elena to Defendant RSM's HR.

45. After Elena returned from vacation in late January, Elena's employment was terminated and thereafter Ms. Mannion was instructed by Defendant RSM's partners, Stacy Dow and Mr. Dimino, not to communicate any of her concerns to HR ever again and advised her that to come directly to them.

46. Despite Elena's dismissal, the vitriol towards Ms. Rabinow did not abate but continued, now through Elena's younger administrative assistants, Michelle Burke and Kaleigh Conley, who were close and well-connected with the Defendant RSM's practice leadership, specifically, Stacey Dow. These individuals continued the personal attacks and unkind behavior towards Ms. Rabinow. During weekly meetings, the hostility towards Ms. Rabinow involved derogatory remarks and denigrating behavior from these assistants.

47. Defendant RSM's practice leadership did not correct this mistreatment but allowed it to continue.

48. Ms. Rabinow again reported this mistreatment to Defendant RSM's HR, but no effective remedial action was taken to cease this misconduct.

49. In mid-February of 2019, Ms. Rabinow met Ms. Dilia Teixeira, who supervised all administrative staff at RSM and later became the Director of Operations for the TAC group, and she reported to her the pain and discomfort she felt as a result of continued hostile conduct from Kaleigh and Michelle. While Dilia acknowledged the seriousness of what had been going on, the mistreatment of Ms. Rabinow continued unabated at the hands of Kaleigh and Michelle. Indeed, Dilia instructed Ms. Rabinow to "model professional behavior" so that Michelle and Kaleigh would learn from Ms. Rabinow. No assistance, however, was provided to Ms. Rabinow.

50. By June 2019, with the hostile environment continuing and further significantly affecting Ms. Rabinow's health, Ms. Rabinow met with Dilia again for help. She told her that the hostile mistreatment was continuing and had affected her mental and physical health, requiring medical treatment from her physician, Dr. Suzanne Gleysteen. She explained that her blood pressure was impacted negatively and that her doctor had asked her to daily measure her blood pressure at home and she discovered it was dangerously high during the week. Once again, however, this effort in seeking Dilia's assistance proved futile as the hostile work environment continued unabated.

51. Meanwhile, Ms. Rabinow continued to excel in her role and had gained a tremendous amount of experience. She continued to receive accolades and was the go-to person for many new TAC employees - helping them navigate the complex and expansive procedural processes.

52. When Ms. Rabinow then met with Dilia and Julie Leone, Director of Operations, for her yearly review, she received positive feedback about her work, her willingness to always jump in, her work ethic, and her positive attitude. They also encouraged her to increase her CRM leadership and encouraged her to follow up with colleagues about new engagements.

53. That strong performance continued as the RSM workload increased with Ms. Rabinow carrying an increasingly heavier burden.

54. During the fall of 2019, Ms. Rabinow continued to receive increased accolades, although the toxic work environment remained and nothing was done to address it. Additionally, another employee, approximately 60 years old, was also criticized for not being "fast enough" and was terminated after only six weeks.

55. During this time, Dilia was also assigned as Ms. Rabinow's Career Advisor, but unlike other younger co-workers, Ms. Rabinow did not receive any career advice

or mentoring during this time. Additionally, at no point did she offer or suggest any areas of improvement or training to Ms. Rabinow, except with respect to Excel. Ms. Rabinow also learned that her pay had been decreased without justification, with a significant discrepancy between the pay she received in September 2018 and December in 2019.

56. Ultimately, and without warning, on December 4, 2019, RSM's efforts to finally terminate Ms. Rabinow's employment were successful when during a meeting with Dilia and Molly Griffiths, RSM's Human Resources representative, Ms. Rabinow was informed that she was being fired. That also happened to be the same date as the TAC departmental holiday party - but it was no holiday for Ms. Rabinow.

57. During this meeting, Ms. Rabinow was informed that her termination was allegedly because of three performance issues. However, not one of these three issues had ever been addressed previously with Ms. Rabinow, and was inconsistent with the positive performance evaluation she received and the numerous performance-based accolades she had received during her tenure with Defendant RSM during her tenure. *See* Exhibit A, Examples of Ms. Rabinow's Positive Performance Accolades. Ms. Rabinow's termination was also inconsistent with Defendant RSM's own personnel policies, providing further evidence of discriminatory animus.

58. During the meeting in which Ms. Rabinow was terminated, she was given the following reasons for her termination: The first reason, for example, was allegedly that Ms. Rabinow did not complete "Goals" online. No one, however, ever asked Ms. Rabinow to complete these goals online prior to using it as a purported justification for termination. It was never discussed at her performance meeting during the summer of 2018 nor at any other subsequent meeting. Moreover, other employees, including approximately half of the TAC department, had also not completed these goals online, but yet they were not terminated.

59. The second reason was the alleged failure to complete online compliance. This is patently false as Ms. Rabinow had in fact completed email compliance requests. Moreover, Ms. Rabinow never was disciplined on such an issue and was never previously advised to address this issue.

60. The third reason given for Ms. Rabinow's termination was her alleged failure to complete the Summary Tab on a recent CRM report and an alleged failure to provide CRM analytics. This constituted yet another false basis for termination. Ms. Rabinow was extremely proficient in the RSM CRM tool. In fact, Erica told her that out of all the administrators at RSM, she was "among the most knowledgeable." Ms. Rabinow provided custom reports whenever TAC team members requested them and she often explained the terminology and the process to anyone who needed clarification or guidance. She had never received a negative comment about her CRM abilities from anyone.

61. Following her wrongful termination, Ms. Rabinow contacted RSM and advised them that she believed that their decision was improperly based on her age and in

8

retaliation for her complaints about the hostile work environment at RSM.

62. Defendant RSM, however, summarily denied Ms. Rabinow's claims and undertook no corrective action or proper investigation.

63. Ms. Rabinow also requested a copy of her personnel file from Defendant RSM. When it provided her the personnel file, she was surprised to learn that the reasons provided to Ms. Rabinow during her termination meeting on December 4, 2019, were entirely different from the reasons documented in her personnel file following her termination.

64. These significant inconsistencies reflect pretext and an attempt by the Defendants to cover up its age-related discrimination and retaliation against Ms. Rabinow after she engaged in protected activity repeatedly reporting her complaints of discriminatory and disparate treatment.

65. Moreover, Ms. Rabinow also discovered additional negative documentation about her performance that was never previously provided or disclosed to Ms. Rabinow before it was included in her personnel file - in violation of the Massachusetts Personnel Records Law. Indeed, these documents do not contain Ms. Rabinow's signature or acknowledgement that she ever received such information.

66. Such efforts also reflect the Defendants' efforts to falsely justify Ms. Rabinow's termination and reflect their discriminatory and retaliatory animus towards Ms. Rabinow. Ms. Rabinow has exhausted all administrative remedies and satisfied all statutory prerequisites. Following her termination, she timely filed a complaint with the Massachusetts Commission Against Discrimination, subsequently withdrew her complaint, and pursued her claims here in Superior Court. All for filing Ms. Rabinow's claims have therefore been exhausted.

## COUNT ONE

### G.L. 151B & ADEA (AGE DISCRIMINATION & HOSTILE WORK ENVIRONMENT)
**<u>Plaintiff v. Defendant RSM</u>**

67. The Plaintiff refers to the allegations of Paragraphs 1 through 66 and by such reference repleads and incorporates them as though fully set forth here.

68. The conduct of Defendant RSM, as set forth above, constitutes willful and unlawful discrimination against the Plaintiff on the basis of her age, in violation of G.L. 151B and the ADEA and resulted in her wrongful termination.

69. As a proximate result of Defendant's conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that she would have received absent Defendant RSM's discrimination. Furthermore, the Plaintiff has incurred additional costs and expenses due to Defendant's discrimination.

9

## COUNT TWO

### G.L. C. 151B & ADEA -AIDING AND ABETTING

### Plaintiff v. Defendants Elena Ver Planck, Dilia Teixeira, Kaleigh Conley, Michelle Burke, & Thomas Dimino

70. The Plaintiff refers to the allegations of Paragraphs 1 through 69, and by such reference repleads and incorporates them as though fully set forth here.

71. At all times relevant, Defendants Elena Ver Planck and Dilia Teixeira were employed by Defendant RSM in supervisory positions, while Kaleigh and Michelle were employed as co-workers.

72. These Defendants, as agents of and supervisors at Defendant RSM, discriminated against the Plaintiff, aided and abetted Defendant RSM in discriminating against the Plaintiff, and substantially interfered with her employment in violation of G.L. c. 151B/ADEA.

73. As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## COUNT THREE

### G.L. 151B & ADEA - RETALIATION

### Plaintiff v. Defendants RSM, Elena Ver Planck, Dilia Teixeira, Kaleigh Conley, Michelle Burke, & Thomas Dimino

74. The Plaintiff refers to the allegations of Paragraphs 1 through 73 and by such reference repleads and incorporates them as though fully set forth here.

75. The conduct of Defendants, as set forth above, constitutes willful and unlawful retaliation against the Plaintiff, in violation of G.L. 151B and ADEA andresulted in her wrongful termination.

76. As a proximate result of Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that she would have received absent Defendant's retaliation. Furthermore, the Plaintiff has incurred additional costs and expenses due to Defendants' retaliation.

## COUNT FOUR

### TORTIOUS INTERFERENCE WITH CONTRACTUAL/ADVANTAGEOUS RELATIONS

### Plaintiff v. Defendants Elena Ver Planck, Dilia Teixeira, Kaleigh Conley, Michelle Burke, & Thomas Dimino

77. The Plaintiff refers to the allegations of Paragraphs 1 through 76 and by such reference repleads and incorporates them as though fully set forth herein.

78. Defendants' conduct, as set forth above, evidenced a spiteful intent to interfere with the Plaintiff's relationship with Defendant RSM and with improper motive, did indeed interfere with this relationship.

79. Additionally, with improper motive and as set forth above, Defendants intentionally interfered with the Plaintiff's relationship with RSM.

80. As a direct and proximate result of the acts and omissions of Defendants, the Plaintiff has been and continues to be damaged in an amount to be determined at trial, including costs, interest and reasonable attorney's fees.

## COUNT FIVE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Plaintiff v. Defendants Elena Ver Planck, Dilia Teixeira, Kaleigh Conley, Michelle Burke, & Thomas Dimino

81. The Plaintiff refers to the allegations of Paragraphs 1 through 80 and by such reference repleads and incorporates them as though fully set forth herein.

82. Defendants knew of the distress their conduct caused the Plaintiff and yet their conduct persisted. Such conduct, and as set forth above, evidenced an intent to inflict emotional distress upon the Plaintiff.

83. Defendants intentionally inflicted emotional distress upon the Plaintiff, and such conduct was extreme and outrageous.

84. As a direct and proximate result of the acts and omissions of Defendants, the Plaintiff has been and continues to be damaged in an amount to be determined at trial, including costs, interest and reasonable attorney's fees.

WHEREFORE, the Plaintiff demands judgment against the Defendants as follows:

a.     That actual damages be awarded to the Plaintiff;

b.     That compensatory damages be awarded to the Plaintiff;

c.     That treble damages be awarded to the Plaintiff;

d.     That punitive damages be assessed against the Defendants;

e.     That the Plaintiff be awarded the costs of this action;

f.     Reasonable attorney's fees; and

g.     Such other and further relief as the court may deem necessary and proper.

**PLAINTIFF REQUESTS A JURY TRIAL**

Respectfully submitted,
Plaintiff,
ELAINE RABINOW,
By her attorney,

*Helen G. Litsas*

_____

Helen G. Litsas
BBO#644848
**LAW OFFICE OF HELEN G. LITSAS**
22 Mill Street, Suite 408
Arlington, MA  02476
(781) 646-1518
781) 643-1126
helen@litsaslaw.com